Brian S. King, Esq.
LAW OFFICE OF BRIAN S. KING
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| CARL S. and CAMERON S., <br><br> Plaintiffs, <br><br> vs. <br><br> OXFORD HEALTH INSURANCE, INC., UNITED HEALTHCARE, INC., and UNITED BEHAVIORAL HEALTH, <br><br> Defendants. | Civil No. 2:16-cv-00041 EJF <br><br> COMPLAINT |

Plaintiffs Carl S. ("Carl") and Cameron S. ("Cameron") (collectively "the S. family"), through their undersigned counsel, complain and allege against Defendants Oxford Health Insurance Inc. ("Oxford"), United Healthcare, Inc. ("UHC"), and United Behavioral Health ("UBH") as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Carl and Cameron are natural persons residing in New York County, New York. Carl is Cameron's father.

2. Carl's employer provides health benefits for its employees and their dependents under a group health benefits plan insured by Oxford ("Oxford plan") and administered by UHC. Carl was a participant in the Oxford plan and Cameron was a beneficiary of the Oxford plan during the time frame at issue in this claim.

3. The Oxford plan is a fully insured employee welfare benefit plan under 29 U.S.C. §1001 *et seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

4. Oxford in an insurance company doing business in New York, New Jersey, and Connecticut and operates as a managed health care company. Oxford covers treatment provided for its insureds outside the geographic area where it does business.

5. UHC is an insurance company doing business across the United States and in the State of Utah. UHC is retained by the Oxford plan to perform various functions including, but not limited to, processing and paying claims and handling appeals for denied claims.

6. UBH is a subsidiary of UHC and handles claims for mental health treatment under the Oxford plan. UBH does business throughout the United States and has a claims processing facility in Salt Lake City, Utah. At least some of Cameron's claims and appeals were processed in the State of Utah.

7. This Court has jurisdiction in this matter under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the Defendants do business in the State of Utah and Cameron's claims were processed in the State of Utah. Plaintiffs wish to bring this case in Utah, as opposed to in New York where they live, to maximize the chance of remaining anonymous. Based on ERISA's nationwide service of process provision and 28 U.S.C. §1391, venue is appropriate in the State of Utah.

9. The remedies the Plaintiffs seek are this Court's Order requiring Oxford to pay the costs of Cameron's medically necessary mental health care pursuant to the terms of the Oxford group plan, an award of prejudgment interest and an award of attorney fees and costs under 29 U.S.C. §1132(g).

**CAMERON'S TREATMENT AND CLAIMS FOR COVERAGE**

10. Cameron was adopted at birth by Carl and his wife.

11. Cameron did well in elementary school, making friends easily and performing on an average level academically.

12. When Cameron reached middle school, she began experiencing symptoms of depression and anxiety. She was diagnosed with attention deficit hyperactive disorder ("ADHD") when she was 14 years old and received some special educational assistance.

13. Cameron also started in outpatient therapy and began taking prescribed medication. She was initially prescribed Lexapro, which caused increased agitation and self-harm. Under the care of an in-plan psychiatrist, several other medications were then tried. Cameron's self harm continued, her mental health continued to deteriorate, and she began hearing voices.

14. Cameron was becoming more and more anxious and agitated, regularly experiencing suicidal thoughts. She began making plans to commit suicide.

15. There was significant family conflict which Cameron was unable to handle. She was engaging in self-harm with extensive cutting on her arms and legs. When prevented or stopped from cutting herself, she would rage and cry for hours.

16. Cameron was admitted to Silver Hill Hospital following a fight with her parents which culminated in a threat to kill herself.

17. Upon her admission at Silver Hill Hospital, Cameron was diagnosed with major depressive disorder, recurrent, severe with psychotic features; generalized anxiety disorder; and ADHD.

18. The treatment team at Silver Hill Hospital recommended intensive dialectical behavior therapy ("DBT") in a long term treatment program. The discharge summary report states:

> Due to patient's persistent off and on suicidality in the context of stressors, and her poor impulse control, it was felt that it was medically necessary for residential treatment, in a treatment setting where patient's social, emotional and educational needs would be addressed simultaneously.

19. Cameron was admitted at Solacium Sunrise Residential Treatment Center ("Sunrise") on May 1, 2013. She was 15 years old.

20. Sunrise is a licensed residential care provider in Washington County, State of Utah. Sunrise is a program providing treatment to girls between the ages of 13 and 18.

21. At the time of her admission, a psychiatric evaluation was completed for Cameron and she was diagnosed as follows:

    Axis I:    296.3 Major Depressive Disorder, Recurrent
                  300.00 Anxiety Disorder, NOS [not otherwise specified]

|  | 314.9 ADHD |
|---|---|
|  | 313.89 R/O [rule out] Reactive Attachment |
| Axis II: | No diagnosis |
| Axis III: | No acute medical problems |
| Axis IV: | Problems with family, social and educational. Self-harm concerns. |
| Axis V: | GAF: 45 |

22. Cameron began participating in regular individual, group, family, and milieu therapies.

23. She continued to assert that she was hearing voices, urging her to harm herself or others, and stated that she was choosing not to do what the voices told her to do.

24. Cameron had ongoing incidences of cutting, even in the restricted and protected environment at Sunrise. Cameron also continued to experience suicidal ideation.

25. A therapy note from November of 2013 states that Cameron continues to be a danger to herself.

26. Cameron made slow but steady progress during her treatment at Sunrise and graduated from the program on May 28, 2014. Cameron returned home at that time and she and her family continued to participate in follow up telephone therapy sessions with the Sunrise therapists for a period of time until Cameron's care could be transferred to local doctors and therapists.

27. Following Cameron's admission, claims were submitted to UBH or Oxford for payment of Cameron's medical expenses. Charges through May 24, 2013 were paid. Claims after May 24, 2013 were denied.

28. UBH wrote to the S. family on May 24, 2013 and stated that coverage after that date was denied on the basis that Cameron's conditions did not meet UBH Level of Care Guidelines for residential treatment. As a result, her treatment was not medically necessary and coverage was excluded under the terms of the Oxford group plan.

29. UBH asserted that:

> [y]ou are not reported to be presenting with any of [*sic*] severe psychosocial dysfunction, severe behavioral problems or serious medical conditions requiring 24-hour care. There was no evidence that you would otherwise need acute inpatient care.

30. On May 29, 2013, UBH wrote to the S. family again. The second letter stated:

> Based on the clinical information provided and UBH Level of Care Guidelines for Mental Health Residential Care, it is my opinion that your treatment can occur in a less restrictive partial hospital program which is available in your area. The current clinical information does not support the medical necessity for residential level of care. You are better able to work on your recovery. You seem to be working well with others and on your recovery goals so that mental health residential treatment is not longer needed. You do not appear to be at risk of harming yourself or others. You have no serious complicating medical problems needing 24-hour care. No barriers are identified that prevent you from attending a less restrictive program. It does not look like you would need mental health inpatient care in you weren't in the residential treatment.

31. Carl appealed the denial on August 9, 2013. First, Carl discussed in detail what the UBH Level of Care Guidelines for residential treatment required in order to qualify a patient for that level of care. Carl then pointed out that UBH obviously believed Cameron's condition met the Level of Care criteria for admission because the claims for the first few weeks of treatment had been paid. He stated that the appropriate tool for assessing ongoing coverage was the Level of Care Guidelines for continued service.

32. Carl pointed out that the UBH reviewer had not provided any specific information about which criteria he believed Cameron did not meet and the basis for denial "was only loosely correlated to these criteria."

33. Carl outlined Cameron's developmental and treatment history and cited numerous treatment notes compiled at Sunrise documenting ongoing self-harm, depression, and anxiety. Carl included with his letter recommendations from Cameron's various therapists and physicians for residential treatment, medical records, and photocopies of Cameron's extensive cutting.

34. Carl concluded his appeal with a request that UBH provide specific information about its rationale for denial of the claim. He stated that it was difficult to submit an intelligent appeal when he had no information about why UBH believed Cameron did not meet UBH criteria for residential treatment.

35. On August 22, 2013, UBH maintained its denial. Some of the language in UBH's denial letter was identical to the earlier denial. The letter also stated that Cameron had "no suicidal ideation, aggression, or active self harming." UBH stated that the internal appeal process was complete and included information about how Carl could request an external review.

36. Carl requested an external review on December 16, 2013 and included voluminous supporting documentation including letters from Cameron's treating therapists and physicians, complete medical records, and copies of all materials from the UBH appeal process.

37. On February 3, 2014, the external reviewer partially overturned UBH's denial, stating that there was sufficient "specific evidence to support that [Cameron] required inpatient mental health treatment in this residential treatment from 5/24/13 until 9/2/13. However, for treatment after September 2, 2013, the external reviewer upheld the denial.

38. UHC/Oxford wrote to the S. family on March 3, 2014 and stated that it continued to believe that its decision to deny all coverage after May 24, 2013 was correct but, based on the decision from the external reviewer, the claims through September 2, 2013, would be paid.

39. Carl exhausted his pre-litigation appeal obligations under the terms of ERISA and his group plan.

**CAUSE OF ACTION**
**Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B)**

40. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon plan fiduciaries such as Oxford, UHC, and UBH, acting as administrators of ERISA plans, to "discharge [their] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plans. 29 U.S.C. §1104(a)(1).

41. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators and their agents provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

42. The Defendants breached their fiduciary duties to the Plaintiffs when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing benefits to them and to provide a full and fair review of the Plaintiffs' claims.

43. The Defendants breached their fiduciary duties to the Plaintiffs when they failed to discharge their duties "in accordance with the documents and instruments governing the plan . . .." 29 U.S.C. §1104(a)(1)(D).

44. The actions of the Defendants in failing to provide coverage for Cameron's medically necessary residential treatment are violations of the terms of the plan.

45. The actions of the Defendants, as outlined above, have caused damage to the Plaintiffs in the form of denial of payment for medical services in an amount exceeding $90,000.

46. The Defendants are responsible to pay Cameron's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Cameron's medically necessary residential treatment under the terms of the plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

//

//

3. For such further relief as the Court deems just and proper.

DATED this 19th day of January, 2016.

                                                                                                                                                                                                                /s/ Brian S. King
                                                                Brian S. King
                                                                Attorney for Plaintiffs

Plaintiffs' Address:

New York County, New York